1
2
3
4
5
6
7

8       **UNITED STATES DISTRICT COURT**

9       **EASTERN DISTRICT OF CALIFORNIA**

10

11    SANDRA LYNN NIZZOLI,                    )    Case No.: 1:17-cv-00502 - JLT
                                                    )
12              Plaintiff,                          )    ORDER DIRECTING ENTRY OF JUDGMENT IN
                                                    )    FAVOR OF DEFENDANT, NANCY A.
13       v.                                         )    BERRYHILL, ACTING COMMISSIONER OF
                                                    )    SOCIAL SECURITY, AND AGAINST PLAINTIFF
14    NANCY A. BERRYHILL,                          )    SANDRA LYNN NIZZOLI
      Acting Commissioner of Social Security       )
15                                                  )
                Defendant.                          )
16                                                  )
                                                    )
17    _____)

18              Sandra Lynn Nizzoli asserts she is entitled to a period of disability, disability insurance benefits,

19    and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff argues

20    the ALJ erred in finding her mental impairments were not severe. Because the ALJ applied the proper

21    legal standards and the step two findings are supported by substantial evidence in the record, the

22    administrative decision is **AFFIRMED**.

23                                    <u>**PROCEDURAL HISTORY**</u>

24              Plaintiff filed applications for benefits in 2013, alleging disability beginning April 14, 2013.

25    (Doc. 10-3 at 29) In her applications, Plaintiff asserted her impairments included "[b]rain damage,

26    arthritis, scoliosis, bipolar, [and] depression." (Doc. 10-4 at 2-3, 16-17)  The Social Security

27    Administration denied the applications at both the initial level and upon reconsideration. (Doc. 10-3 at

28    29) After requesting a hearing, Plaintiff testified before an ALJ on July 15, 2015. (*Id.* at 29, 48) The

                                                    1

ALJ determined Plaintiff was able to perform work in the national economy and issued an order denying benefits on August 7, 2015. (*Id.* at 29-41) Plaintiff requested review of the ALJ's decision by the Appeals Council, which denied the request on February 9, 2017. (*Id.* at 2-5) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability,

the burden shifts to the Commissioner to show the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§404.1520, 4126.920(a)-(f). The process requires the ALJ to determine whether the Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416. 927.

## A.    Relevant Medical Evidence[1]

On October 8, 2012, Plaintiff visited the Tuolumne Me-Wuk Indian Health Clinic ("Tuolumne Clinic"), and her primary complaint was back pain. (Doc. 10-8 at 10)  Lorie Weldon, FNP, noted Plaintiff's prescriptions included Citalopram (Celexa) for depression, and Plaintiff reported her "depression [was] controlled with medication."  (*Id.* at 10-11)

On October 31, 2012, Plaintiff began physical therapy with Derick Alkema, MPT, for her physical impairments. (Doc. 10-8 at 13; Doc. 10-9 at 36) She completed a patient questionnaire, indicating she had "a lot of difficulty concentrating" and her sleep was "greatly disturbed." (Doc. 10-9 at 33)  In addition, she indicated that pain prevented her "from participating in more energetic activities," such as sports and dancing.  (*Id.* at 35)  Mr. Alkema noted Plaintiff "present[ed] with fear avoidance behavior and routinely expresse[d] fear based thoughts."  (*Id.* at 36)

On April 30, 2013, Plaintiff went to the hospital for abdominal pain and nausea. (Doc. 10-9 at 25) Dr. Juanito Villanueva noted Plaintiff's medical history included "psychiatric disease." (*Id.* at 26) He described Plaintiff as cooperative with an "appropriate mood [and] affect." (*Id.*).

On June 11, 2013, Plaintiff visited the Tuolumne Clinic, requesting an "extension of disability

---

[1] The Court has reviewed the entirety of the medical record.  However, Plaintiff challenges only the ALJ's evaluation of medical evidence related to her mental impairments. Accordingly, the summary focuses on evidence related to Plaintiff's mental impairments.

due to her chronic abdominal pain/bloating." (Doc. 10-8 at 6)  In addition, Plaintiff told Ms. Weldon that she was "feeling more depressed" and "very irritable." (*Id.*)  She stated that she had homicidal thoughts in the past two weeks and felt "like [she] could hurt someone." (*Id.*) Ms. Weldon observed that Plaintiff had a normal mood and affect, and was "[o]riented to person, place, and time."  (*Id.* at 7) Further, Ms. Weldon noted that Plaintiff had a normal memory and judgment.  (*Id.*)  Ms. Weldon diagnosed Plaintiff with "Depressive Disorder, Not Elsewhere Classified," and prescribed a trial of Abilify.  (*Id.* at 7-8)

At a follow-up appointment on June 24, 2013, Plaintiff told Ms. Weldon that Abilify "helped greatly" and requested a prescription for the medication. (Doc. 10-8 at 4) The following month, Plaintiff again reported that Abilify was "working well" for her agitation and depression. (*Id.* at 2)

In August 2013, Plaintiff returned to the hospital for abdominal pain.  (Doc. 10-9 at 16)  Dr. Villanueva noted that Plaintiff "appeared comfortable" from the door, but when he entered the room Plaintiff "began wincing and grabbing her abdomen."  (*Id.* at 17)  He opined Plaintiff did not appear in acute distress, and she had an appropriate mood and affect. (*Id.* at 17-18) In addition, Dr. Villanueva noted that he did not observe any neurological deficits.  (*Id.* at 18)

In October 2013, Plaintiff went to the emergency room for abdominal pain, where she was examined by Drs. Kimberlee Reed, Kimberly Freeman, and Sunil Thaghalli. (Doc. 10-9 at 2)  Dr. Reed described Plaintiff as a "[p]leasant woman, not in any acute distress, talkative and cooperative." (*Id.*) The physicians noted Plaintiff's "active" medical history included anxiety and mental health, and that Plaintiff had a "past medical history of chronic abdominal pain, bipolar disorder and depression."  (*Id.* at 6, 8)  Dr. Thaghalli noted that Plaintiff received antidepressant medications and was directed "to follow up with her psychiatrist as an outpatient."  (*Id.* at 6)

Dr. Michael Cohn performed a consultative psychiatric evaluation on November 19, 2013. (Doc. 10-10 at 18)  Dr. Cohn noted he did not have any medical records to review, and Plaintiff was the sole source of all information. (*Id.*)  Her chief complaints were "[m]emory problems and concentration problems." (*Id.*) Plaintiff reported that she lived with a roommate, took care of her personal hygiene without difficulty, "had no difficulty completing household tasks," paid bills and handled cash, went out alone, had "fair" relationships with friends and family, and completed household tasks. (*Id.* at 19)

Dr. Cohn determined that Plaintiff's "[c]oncentration, persistence, and pace were adequate." (*Id.*) He also noted that Plaintiff's "mood was euthymic and affect was within normal limits and congruent with thought content," which was "not delusional." (*Id.* at 20) Dr. Cohn found Plaintiff was "able to repeat five digits forward," "recall three items immediately without difficulty," and "recall three items after five minutes." (*Id.*) Further, Plaintiff could "recall facts from her childhood, as well as events that occurred during her childhood without difficulty," which Dr. Cohn opined "indicat[ed] no difficulties with past memory." (*Id.*)

Dr. Cohn gave Plaintiff a GAF score of 82.[2] (Doc. 10-10 at 21) Dr. Cohn found "no evidence" of Plaintiff's reported memory and concentration problems "on the mental status examination." (Doc. 10-10 at 21) He noted Plaintiff admitted "to using cannabis on a daily basis," and as a result opined her prognosis was poor because "[p]ersons with substance abuse problems rarely recovery fully or for any length of time." (*Id.*) Dr. Cohn concluded Plaintiff had an "unimpaired" ability to understand, remember, and carry out both simple and complex instructions; "to relate an interact with coworkers and the public;" "to maintain concentration and attention, persistence, and pace;" "accept instructions from supervisors;" "maintain regular attendance in the work place and perform work activities on a consistent basis" and "perform work activities without special or additional supervision." (*Id.* at 21-22) He noted this functional assessment was "predicated on the notion that the claimant would stop using drugs." (*Id.* at 22)

Dr. Vea reviewed the record and Diagnosed Plaintiff with "Affective Disorder" and "Drugs, Substance Addiction Disorder[]" on December 11, 2013. (Doc. 10-4 at 9-11) Dr. Vea noted Plaintiff took care of her personal hygiene, paid her bills and handled cash appropriately, was "able to go out alone without difficulty," reported her relationships were fair, cooked, cleaned, did household chores, went shopping, watched television, and read. (*Id.* at 11) Dr. Vea concluded Plaintiff had no restrictions with her activities of daily living; no difficulties with maintaining social functioning; and mild difficulties with maintaining concentration, persistence, and pace. (*Id.* at 10)

---

[2] The Global Assessment of Functioning scale range from 1-100, and is a "rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Garrison v. Colvin*, 759 F.3d 995 1002 n. 4 (9th Cir. 2014) (quoting *Vargus v. Lambert*, 159 F.3d 1161, 1164 n. 2 (9th Cir. 1998)). A GAF score between 81-90 indicates "[a]bsent or minimal symptoms... good functioning in all areas, interested and involved in a wide range of activites, socially effective, generally satisfied with life, no more than everyday problems or concerns." American Psychiatric Association, *Diagnostic and Statistical Manuel of Mental Disorders*, 34 (4th ed.) ("DSM-IV").

On January 6, 2014, Plaintiff had an appointment with Ms. Weldon regarding chest pain and cough. (Doc. 10-10 at 25)  She requested an "extension of disability," and also told Ms. Weldon that she had "appealed her social security disability claim."  (*Id.*)

On January 24, 2014, Plaintiff visited Tuolumne County Behavioral Health ("County Health"), requesting "medication and counseling services." (Doc. 10-13 at 2) She reported she was "unsatisfied with [her] current primary care physician in terms of her mental health services." (*Id.*) Britton Brown, MHRS, completed an assessment, and noted Plaintiff had a "disorganized thought pattern and often needed to be redirected to [the] assessment topic." (*Id.*)  Ms. Brown noted Plaintiff reported a "history of bipolar disorder," depression, and anxiety "since she was 14 years old." (*Id.*)  Plaintiff said her medications for "outbursts related to Bipolar Disorder [were] not working" and she had a "limited desire to complete daily activities." (*Id.*)  Further, Plaintiff said "her relationships with friends have suffered due to her erratic moods." (*Id.*)  Plaintiff acknowledged a history of using alcohol, cocaine, methamphetamines; and said she had been sober from these substances for six years. (*Id.*)  However, she reported she "smoke[d] marijuana on a daily basis for pain and anxiety." (*Id.*)  Plaintiff also told Ms. Brown she had a "history of brain trauma due to [a] car accident that she relate[d] to … limited memory recall." (*Id.* at 3)  Ms. Brown indicated Plaintiff should receive outpatient services.  (*Id.*)

On February 5, 2014, Plaintiff visited the Tuolumne Clinic and reported that she had been without Abilify for a week due to an insurance change. (Doc. 10-12 at 25) Ms. Weldon opined Plaintiff had a "normal" mood, affect, memory, and judgment. (*Id.*) The same date, the comprehensive intake assessment was completed at County Health by Monique Rodriguez, MHRS.  (Doc. 10-13 at 5-21) Plaintiff believed she was "unable to work due to 'multiple health concerns,'" and told Ms. Rodriguez that she was on state disability and in the process of applying for Social Security.  (*Id.* at 5)  Plaintiff reported there were days she had "a lot of energy" and others where she did not "leave [her] bed and won't shower or brush [her] hair." (*Id.*) Plaintiff also reported she had a history of self-harm (cutting), physical abuse, sexual abuse and emotional abuse. (*Id.* at 5, 9)  Ms. Rodriguez observed that Plaintiff appeared dirty, though she had on appropriate attire.  (*Id.* at 16)  She indicated Plaintiff made good eye contact and had a logical thought process. (*Id.* at 16, 18)  She also noted Plaintiff exhibited a sad mood and her thought content was depressive.  (*Id.* at 17-18) Ms. Rodriguez gave her a GAF score of 41

because Plaintiff "experience[d] physical pain due to health issues," was "unable to work," and had "impaired" activities of daily living and interpersonal relationships.[3] (*Id.* at 20-21) Ms. Rodriguez recommended Plaintiff receive medication and routine therapy. (*Id.* at 15)

Plaintiff again reported being without medication in February 2014. (Doc. 10-12 at 23; Doc. 10-13 at 30) On February 18, she called County Health and spoke to Ms. Brown, who noted that Plaintiff spoke with "a low flat voice" and reported isolative behavior, feeling self-conscious about a broken tooth. (Doc. 10-13 at 30) Ms. Brown discussed Plaintiff's coping skills and support systems with her, and believed Plaintiff "sounded cheerful by [the] end of [the] phone call." (*Id.*) The following day, Plaintiff had an appointment with Ms. Weldon at the Tuolumne Clinic. (Doc. 10-12 at 23) Ms. Weldon opined Plaintiff's depression was "well managed" with Celexa and Abilify, and she and gave Plaintiff samples of Abilify until the treatment authorization request was processed by her pharmacy. (*Id.*)

Dr. James Glover performed a psychiatric evaluation at County Health on February 26, 2014. (Doc. 10-13 at 85) Plaintiff reported she had depression that lasted 2-3 days, which would be followed by 1-2 days where "she [was] very busy and talkative." (*Id.*) Plaintiff's reported symptoms also included "racing thoughts, risky behavior, overspend[ing]," angering easily, and needing sleep. (*Id.*) Dr. Glover noted Plaintiff reported a prior diagnosis of bipolar disorder as a teen, though she "never saw a psychiatrist." (*Id.*) Dr. Glover observed that Plaintiff had a normal mood with a labile affect. (*Id.*) He opined Plaintiff's memory was intact, her attention span was intact, and she had an adequate general fund of knowledge. (*Id.* at 86) Dr. Glover diagnosed Plaintiff with Bipolar 2 Disorder, Post-Traumatic Stress Disorder, and polysubstance dependence. (*Id.*) He gave Plaintiff a current GAF score of 40.[4] (*Id.* at 86) He prescribed Plaintiff Desyrel, Tenex, and Latuda; and he recommended Plaintiff consider individual therapy. (*Id.*)

Dr. Uwe Jacobs reviewed the Social Security Administration's records and completed a psychiatric review technique assessment on March 3, 2014. (Doc. 10-4 at 39) He noted Plaintiff had

---

[3] A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* at 34.

[4] A GAF score between 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work)." *Id.*

been diagnosed with "Affective Disorders" and "Drugs, Substance Addiction Disorder." (*Id.*) According to Dr. Jacobs, Plaintiff had no restrictions with activities of daily living; no difficulties in maintaining social functioning, and no repeated episodes of decompensation for an extended duration. (*Id.*) Dr. Jacobs found mild difficulties in maintaining concentration, persistence, or pace. (*Id.*). He concluded Plaintiff's mental impairments were non-severe. (*Id.*)

Also on March 3, 2014, Plaintiff had her first individual therapy session at County Health. (Doc. 10-3 at 34) Plaintiff reported that her symptoms included depression, lack of motivation, and sleep disturbance. (*Id.* at 34, 24) Donna Villanueva, MFTI, noted Plaintiff reported "physical pain due to health issues" and that her "mood lability… impaired [activities of daily living] and interpersonal relationships. (*Id.* at 22) Ms. Villanueva gave Plaintiff a current GAF score of 40. (*Id.*)

On March 11, 2014, Plaintiff called County Health, and reported that Latuda was "causing her to go from agitation [and] irritability to tearful and crying." (Doc. 10-13 at 35) She reported that she had a fight with her husband that "almost resulted in him kicking her out of the house." (*Id.*) Plaintiff was directed to reduce the amount of Latuda she was taking until her next appointment. (*Id.*) That same day, Plaintiff visited the hospital for a cough, and Dr. Jack St. Clair opined Plaintiff did not exhibit any neurologic or psychiatric symptoms. (Doc. 10-11 at 26)

On March 26, 2014, Dr. Glover opined Plaintiff's medications were "partially effective," because the "Tenex [worked] well for nightmares." (Doc. 10-13 at 83) Dr. Glover observed that Plaintiff had a normal mood; appropriate affect; and intact thought process, memory, and judgment. (*Id.*) He discontinued Plaintiff's prescription for Latuda and added Fanapt. (*Id.* at 84)

On April 8, 2014, Plaintiff told Ms. Villanueva that her medication was "working" and she was "feeling better," with a "little up and down." (Doc. 10-13 at 38) However, the following week, Plaintiff called County Health to say that "Fanapt [was]… not working for her." (*Id.* at 39) Chris Lowe, PT, noted plaintiff was "crying [and] angry," and did not want to increase the dosage as she was expected to do at the end of the week. (*Id.*) On April 22, Dr. Glover reduced the prescription for Fanapt from 3mg to 2mg, noting the medication helped "prevent manic episodes but not depression." (*Id.* at 81) He noted Plaintiff's mood was normal and she had an intact memory and through process. (*Id.*) Plaintiff wanted to try Prozac, which Dr. Glover prescribed in the amount of 20mg. (*Id.* at 81-82)

In May 2014, Plaintiff had two appointments at the Tuolumne Clinic, where she was observed to have an appropriate affect and intact cognition. (Doc. 10-12 at 19, 21) The same month, Mr. Lowe and Dr. Glover opined Plaintiff's medications were effective. (Doc. 10-13 at 45, 79) Dr. Glover observed that Plaintiff had an intact memory, judgment, insight, and thought process; and her mood was normal, with an appropriate affect. (*Id.* at 79)

On June 19, 2014, Plaintiff told Ms. Villanueva that she was depressed and had low energy, despite medication compliance. (Doc. 10-13 at 46) Ms. Villanueva observed that Plaintiff sat with her eyes closed and was "unable to focus due to physical pain." (*Id.*) The following day, Plaintiff called County Health and requested that Dr. Glover increase her prescription for Prozac, because she was "depressed and emotional along with being really tired." (*Id.* at 47) Dr. Glover declined to give Plaintiff a higher dose and instead suggested she stop Prozac and may try Seroquel, which Plaintiff declined. (*Id.* at 48) Mr. Lowe noted that Plaintiff's Prozac was discontinued. (*Id.* at 50) However, Plaintiff called County Health again on June 27, and spoke to Mr. Lowe, who noted Plaintiff "was angry" that Dr. Glover did not want to increase the Prozac. (*Id.*) Mr. Lowe also noted that Plaintiff reported she had doubled her dose of Prozac "for about 3 days" and had been taking 40mg, which she thought was working. (*Id.*)

At a check-up on July 24, 2014, Dr. Glover indicated Plaintiff's medications were partially effective. (Doc. 10-13 at 77) Plaintiff reported Tenex was not working, so she stopped taking it. (*Id.*) She also said she had been off Abilify for two weeks and was "doing okay without it," so Dr. Glover discontinued the prescription. (*Id.* at 77-78) He directed Plaintiff to take two Prozac pills each morning, increasing the dose to 40mg. (*Id.* at 78) Upon examination, Dr. Glover opined Plaintiff had normal mood, with calm motor activity and appropriate affect. (*Id.* at 77) In addition, he found she had an intact thought process, memory, judgment, and insight. (*Id.*) The next day, Plaintiff visited the Tuolumne Clinic where Carol Wiley, FNP, also observed that Plaintiff had an appropriate affect and intact cognition. (Doc. 10-12 at 15)

On August 9, 2014, Plaintiff visited SRMC regarding ear pain. (Doc. 10-11 at 20) Dr. Tran noted Plaintiff was cooperative with appropriate mood and affect. (*Id.*) In addition, Dr. Tran noted Plaintiff's depression was not an active problem. (*Id.* at 19) Later that month, Ms. Villanueva opined

Plaintiff was "tolerating medication well" and had a "good response to treatment." (Doc. 10-13 at 55)

In October 2014, Plaintiff had an appointment with Dr. Glover after breaking her right ankle, and she was in a wheelchair. (Doc. 10-13 at 75) She reported that she had been depressed after being off Prozac, and that a friend had killed herself in September. (*Id.*) Plaintiff also told Dr. Glover that her nightmares were gone, and she was no longer hypervigilant or startled easily. (*Id.*) She stated that she avoided "people that remind her of abuse issues and people who are arguing." (*Id.*) Dr. Glover opined Plaintiff's medications were partially effective at that time. (*Id.*) However, he again opined that Plaintiff had a normal mood; appropriate affect; and intact memory, thought process, judgment, and insight. (*Id.*) He directed Plaintiff to return in twelve weeks. (*Id.* at 78)

In November 2014, Plaintiff told Ms. Villanueva that she was depressed and having feelings of grief and guilt over her friend's suicide, believing she "should have []done something." (Doc. 10-13 at 64) Plaintiff also reported "poor" activities of daily living. (*Id.*) Ms. Villanueva noted Plaintiff was experiencing physical problems including a broken foot, chronic pain, pneumonia, and pleurisy. (*Id.*) She spoke to Plaintiff about "the stages of the grieving process" and helped Plaintiff identify the stage was working through at that time. (*Id.*)

Plaintiff had a medication evaluation with Dr. Glover on January 15, 2015. (Doc. 10-13 at 73) Plaintiff reported that Fanapt was "keeping her moods stable." (*Id.*) In addition, she said she had a poor appetite and Trazodone made "her stomach queasy" if she took the 200mg. (*Id.*) Dr. Glover advised Plaintiff "to try cutting back to a lower dose." (*Id.*) He opined Plaintiff's medications were partially effective. (*Id.*) With the mental status exam, Dr. Glover determined Plaintiff had a normal mood; appropriate affect; cooperative behavior; and intact memory, thought process, judgment, and insight. (*Id.*) Further, he opined that Plaintiff's progress was stable. (*Id.* at 74)

On January 28, 2015, Dr. James Wengert identified all of Plaintiff's active and past medical problems and diagnoses, and noted her active problems included anxiety and "[m]ental health history." (Doc. 10-11 at 4-5) Dr. Wengert identified Plaintiff's depression as a "canceled" problem. (*Id.* at 5)

**B.     Administrative Hearing Testimony**

Plaintiff's counsel questioned her regarding her mental impairments at the hearing, noting that the records indicated she had been diagnosed with depression and bipolar disorder. (Doc. 10-3 at 63)

10

Plaintiff testified that she was still affected by these conditions, but her medication "help[ed] with the conditions a lot." (*Id.*) She explained that without her medication for depression, she would "want to stay in bed" and not "want to do anything." (*Id.*) Plaintiff testified that without her bipolar medication, she would "really lose it" and "go off." (*Id.*) She said she still had "bipolar moments" where she would "go off at people," but it was "not as bad." (*Id.* at 64)

She reported that she "always had memory loss" and would "lose [her] concentration very easily." (Doc. 10-3 at 64) She stated she had brain damage when two months old where she "stopped breathing for five minutes," which she believed caused her memory loss. (*Id.*) Plaintiff said she found it difficult to remember things in the past and she could "forget what [she was] talking about." (*Id.*) Further, Plaintiff said she had "a learning disability" that prevented her from spelling and doing math, though she could "read okay." (*Id.* at 70)

**C.     Lay Witness Statement**

Thomas Ledesma, a friend of Plaintiff, completed a third-party function report on October 21, 2013. (Doc. 10-7 at 14-22) Mr. Ledesma reported that he had known Plaintiff for three years. (*Id.* at 14) He noted that Plaintiff could prepare meals daily, take care of pets, and wash dishes. (*Id.* at 14, 16) When asked what Plaintiff was able to do before her illness that she could no longer do, he responded: "take care of me." (*Id.* at 15) In addition, Mr. Ledesma noted that Plaintiff could not "cook as much," and preparing a meal could take "1/2 to 1 hr." (*Id.* at 16) He also reported Plaintiff could do laundry with help, and performing chores took two hours each week. (*Id.*)

Mr. Ledesma noted that Plaintiff's hobbies included reading and watching television, which she did "everyday" and could do "well." (Doc. 10-7 at 18) He believed she had a "loss of interest in hobbies so much." (*Id.*) He indicated Plaintiff did not spend time with others, though she attended church twice each week. (*Id.*) Mr. Ledesma indicated Plaintiff did not "have any problems getting along with family, friends, neighbors, or others," though she engaged in "less" social activities since her illness and conditions began. (*Id.* at 19)

Further, Mr. Ledesma indicated Plaintiff "can't function with pain," and it affected her ability to complete tasks, concentrate, and get along with others. (Doc. 10-7 at 19) He stated Plaintiff could not pay "much" attention, and she did not finish what she started. (*Id.*)

**D.     The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined first that Plaintiff did not engage in substantial gainful activity after the alleged onset date of April 14, 2013.  (Doc. 10-3 at 31)  At step two, the ALJ found:

> The claimant has the following medically severe combination of impairments: arthritis; scoliosis; diabetes mellitus; hypertension; a history of irritable bowel syndrome; degenerative disc disease of the lumbar spine; gastroesophageal reflux disease; hepatitis C virus; hiatal hernia; a history of right ankle fracture status post repair surgery and open reduction internal fixation on September 9, 2014; asthma; bronchitis; obesity; and a history of acute venous embolism and thrombosis of the right lower extremity and acute pulmonary embolism[.]

(*Id.*)  The ALJ noted Plaintiff alleged several mental impairments, including "brain damage, bipolar disorder, post-traumatic stress disorder, depression versus depressive disorder not otherwise specified, polysubstance abuse, and marijuana dependence."  (*Id.* at 32)  The ALJ found these impairments "considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore non-severe."  (*Id.*)  At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing.  (*Id.* at 34)

Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform a wide range of light work... with the following limitations: she can lift and carry 10 pounds frequently and 20 pounds occasionally. In an 8-hour workday, she can stand for 6 hours, walk for 6 hours, and sit for 6 hours. She is limited to no more than occasional climbing of ladders, ropes, and scaffolds. She is limited to no more than occasional stooping, kneeling, crouching ,crawling, and climbing of ramps and stairs. In addition, she must avoid concentrated exposure, i.e., intense, continuous, intractable, unremitting exposure to hazards (e.g. dangerous and unprotected moving machinery, heights, and bodies of water), pulmonary irritants (e.g. fumes, odors, dust, gases, and poorly ventilated areas), temperature extremes, dampness, and vibrations.

(Doc. 10-3 at 35)  With these limitations, the ALJ found Plaintiff was not able to perform any past relevant work.  (*Id.* at 39)  However, at step give, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the claimant can perform."  (*Id.* at 40)  Thus, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act.  (*Id.* at 41)

## DISCUSSION AND ANALYSIS

Plaintiff argues that the ALJ erred at step two of the sequential evaluation finding that she

"does not suffer from a severe mental impairment." (Doc. 14 at 4)  According to Plaintiff, the ALJ erred in evaluating the medical record, discounting the Plaintiff's low GAF scores, and considering the lay witness statement. (*Id.* 4-9) On the other hand, the Commissioner argues that substantial evidence supports the ALJ's findings at step two. (Doc. 16 at 4-7)

## A.    Waiver

An ALJ is required to make credibility determinations in each decision, to determine whether a claimant's subjective complaints should be credited.  *See Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015).  The Ninth Circuit explained, "To ensure that our review of the ALJ's credibility determination is meaningful, and that the claimant's testimony is not rejected arbitrarily, we require the ALJ to specify which testimony she finds not credible, and then provide clear and convincing reasons, supported by evidence in the record, to support that credibility determination." *Id.*  Here, the ALJ found Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms" lacked credibility.  (Doc. 10-3 at 37) Plaintiff does not address the ALJ's findings regarding the credibility of her subjective complaints.

The Ninth Circuit "has repeatedly admonished that [it] cannot 'manufacture arguments for an appellant.'"  *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (quoting *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994)). Rather, the Court will "review only issues with are argued specifically and distinctly." *Id.*  Therefore, when a claim of error is not argued and explained, the argument is waived.  *See, id.* at 929-30 (holding that party's argument was waived because the party made only a "bold assertion" of error, with "little if any analysis to assist the court in evaluating its legal challenge"); *see also Hibbs v. Dep't of Human Res.*, 273 F.3d 844, 873 n.34 (9th Cir. 2001) (finding the assertion of error was "too undeveloped to be capable of assessment").

Because Plaintiff does not address the adverse credibility determination in her opening brief, any challenge to the credibility determination has been waived.  *See Bray v. Comm'r of Soc. Sec. Admin*, 554 F.3d 1219, 1226 n.7 (9th Cir. 2009) (where a claimant failed to raise an argument in the opening brief, the Court deemed it waived); *Zango v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 n. 8 (9th Cir.2009) ("arguments not raised by a party in an opening brief are waived").

*///*

13

## B.  Rejecting a Lay Witness Statement

When evaluating the severity of a claimant's symptoms, the ALJ must consider statements of "non-medical sources" including spouses, parents, and other persons.  20 C.F.R. § 404.1513(d)(4); *see also Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006) ("In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to do work."). As a general rule, "lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphasis and internal citations omitted).  To discount the testimony of a lay witness, the ALJ must give specific, germane reasons for rejecting the opinion of the witness.  *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).

In support of her arguments regarding the ALJ's findings, Plaintiff refers to the function report completed by Mr. Ledesma.  (Doc. 14 at 4-5)  However, Plaintiff fails to acknowledge that the ALJ gave "little weight" to the report completed by Mr. Ledesma.  (*See* Doc. 10-3 at 39)  The ALJ found the statements of Mr. Ledesma "largely corroborate[d] the claimant's allegations."  (Doc. 10-3 at 39) Notably, the Ninth Circuit concluded that when an ALJ identifies clear and convincing reasons for rejecting the subjective complaints of a plaintiff, and third party testimony is "similar to such complaints," the reasons identified for rejecting the plaintiff's testimony may be germane reasons for rejecting similar testimony of the third party. *Valentine v. Astrue*, 574 F.3d 685, 694 (9th Cir. 2009).

The ALJ set forth several reasons for rejecting Plaintiff's credibility, including her level of activity, inconsistencies with the medical record, the lack of aggressive treatment, and poor work history.  (*See* Doc. 10-3 at 35- 38)  The Ninth Circuit determined each of these are relevant factors for the credibility determination, and they are clear and convincing reasons for rejecting Plaintiff's subjective complaints.[5]  Likewise, the ALJ found Mr. Ledesma's statements—which were similar to

---

[5] The Ninth Circuit has determined each of these factors are relevant when evaluating a claimant's credibility, and may support an ALJ's adverse credibility finding.  *See, e.g., Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008) (a claimant's ability to cook, clean, do laundry and manage finances may be sufficient to support an adverse finding of credibility); *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (holding the "lack of medical evidence… is a factor that the ALJ can consider in his credibility analysis); *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) finding the ALJ did not err in considering the claimant's poor work history); *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the treatment a claimant received, especially when conservative, is a legitimate consideration in a credibility finding); 20 C.F.R. § 404.1529(c) (indicating an ALJ will consider the type, dosage, and effectiveness of medication).

Plaintiff's statements concerning her abilities—were inconsistent with Plaintiff's level of activity and the medical record.  (*See* Doc. 10-3 at 39) These are also germane reasons for rejecting the lay witness statement from Mr. Ledesma.  *See Valentine*, 574 F.3d at 694; *Bayliss v. Barnhart*, 427 F.3d 1211, 1211 (9th Cir. 2005) ("inconsistency with medical evidence is one [germane] reason"); *Carmickle v. Comm'r of SSA*, 533 F.3d 1155, 1161 (9th Cir. 2008) (inconsistency with a claimant's activities a germane reason).

Moreover, Plaintiff does not specifically challenge the ALJ's evaluation of the statement from Mr. Ledesma.  Consequently, Plaintiff waived any challenge to the evaluation of the lay witness testimony.  *See Bray*, 554 F.3d at 1226, n.7; *Zango*, 568 F.3d at 1177, n.8.

## C.      Step Two Findings

The inquiry at step two is a *de minimus* screening for severe impairments "to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-54 (1987)). The purpose is to identify claimants whose medical impairment makes it unlikely they would be disabled even if age, education, and experience are considered.  *Bowen*, 482 U.S. at 153 (1987).  At step two, a claimant must make a "threshold showing" that (1) she has a medically determinable impairment or combination of impairments and (2) the impairment or combination of impairments is severe. *Id*. at 146-47; see also 20 C.F.R. §§ 404.1520(c), 416.920(c). Thus, the burden of proof is on the claimant to establish a medically determinable severe impairment. *Id*.; *see also Bray v. Comm'r of Soc. Sec. Admin*, 554 F.3d 1219, 1222 (9th Cir. 2009) ("The burden of proof is on the claimant at steps one through four...").

An impairment, or combination thereof, is "not severe" if the evidence establishes that it has "no more than a minimal effect on an individual's ability to do work."  *Smolen*, 80 F.3d at 1290.  For an impairment to be "severe," it must limit the claimant's ability to do basic work activities, or the "abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1520(c), 416.920(b). Specifically, basic work activities include "[u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations, and [d]ealing with changes in a routine work setting." 20 C.F.R. §§ 404.1521(b), 416.921(b).

1          1.      "Paragraph B" criteria

2          The "Paragraph B" criteria set forth in 20 C.F.R., Pt. 404, Subpart P, App. 1 are used to evaluate

3  the mental impairments of a claimant, and include: "[a]ctivities of daily living; social functioning;

4  concentration, persistence, or pace; and episodes of decompensation." *See id.* The Regulations inform

5  claimants:

6          If we rate the degree of your limitation in the first three functional areas as "none" or
           "mild" and "none" in the fourth area, we will generally conclude that your impairment(s)
7          is not severe, unless the evidence otherwise indicates that there is more than a minimal
           limitation in your ability to do basic work activities.
8

9  20 C.F.R. § 404.1520a(d)(1).  The ALJ found Plaintiff's "medically determinable mental impairments

10 cause no more than 'mild' limitation in any of the first functional areas and 'no' episodes of

11 decompensation." (Doc. 10-3 at 34) As a result, the ALJ concluded Plaintiff's mental impairments "are

12 non-severe." (*Id.*)

13          a.      *Existence of mental impairments*

14         As an initial matter, Plaintiff contends "the medical evidence amply demonstrates that [she]

15 does suffer from a bona fide mental impairment that merited evaluation at the subsequent steps of the

16 sequential analysis." (Doc. 14 at 9)  However, the Ninth Circuit explained: "The mere existence of an

17 impairment is insufficient proof of a disability." *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).

18 A medical diagnosis alone "does not demonstrate how that condition impacts plaintiff's ability to

19 engage in basic work activities." *Nottoli v. Astrue*, 2011 U.S. Dist. LEXIS 15850, at *8 (E.D. Cal. Feb.

20 16, 2011).

21         Notably, it is undisputed that the ALJ determined Plaintiff suffered from medically

22 determinable mental impairments. (*See* Doc. 10-3 at 32) The ALJ noted Plaintiff's impairments

23 included "brain damage, bipolar disorder, post-traumatic stress disorder, depression versus depressive

24 disorder not otherwise specified, polysubstance abuse, and marijuana dependence." (*Id.*)  However,

25 Plaintiff must establish not only that she suffered from these impairments, but also that they were

26 severe. *See Bowen*, 482 U.S. 146-47; 20 C.F.R. §§ 404.1520(c), 416.920(c).  Accordingly, the Court

27 must review the ALJ's findings regarding the severity of the impairments and with the first three

28 domains of the Paragraph B criteria, which are challenged by Plaintiff. (*See generally* Doc. 14 at 4-9)

### b. *Activities of daily living*

The ALJ found "little objective evidence that [Plaintiff] has had significant difficulties with activities of daily living because of [her] mental impairments." (Doc. 10-3 at 32) Instead, the ALJ noted Plaintiff' was "independent in personal care," and she could perform chores, prepare simple meals, do laundry, handle her own finances, and help take care of a pet dog." (*Id.*) In addition, ALJ noted that Dr. Cohn's report indicated Plaintiff had "no difficulty completing household tasks or making decisions on a daily basis." (*Id.*, citing Exh. 6F [Doc. 10-10 at 18-22]) Further, the ALJ observed that Plaintiff testified her "psychiatric medications are admittedly effective in reducing her mental symptoms, which indicates that her mental functioning is generally intact."[6] (*Id.*) Thus, the ALJ concluded Plaintiff had "no more than mild limitation in this domain." (*Id.*)

Plaintiff asserts that the ALJ erred in finding little objective evidence that her mental impairments caused no more than a mild limitation with her activities of daily living. (Doc. 14 at 5-6) Plaintiff refers to the following evidence to support this contention:

> As to the activities of daily living, a function report dated October 3, 2013, indicated that Nizzoli can prepare meals but cannot cook as much; can do laundry with help; takes her two hours once a week to do chores; cannot pay attention much; does not follow written instructions; cannot handle stress well; and needs aides to read. AR 266-270. On January 13, 2014, another function report indicated that Nizzoli started to experience memory loss. AR 306. At the hearing, Nizzoli testified that she stays in bed and does not want to get up. AR 62.

(*Id.*) According to Plaintiff, the ALJ did not take "the entirety of her report into consideration" when evaluating Plaintiff's daily activities. (*Id.* at 6)

Significantly, Plaintiff refers to only the statements of Mr. Ledesma and her own reports to support her argument that the ALJ erred in evaluating her daily activities. The function report dated October 2013 was the lay witness statement of Mr. Ledesma, and the function report dated January 2014 was Plaintiff's report to the Social Security Administration, at the reconsideration level where she was asked if there had been any changes in her conditions. (*See* Doc. 10-7 at 14-22, 56) As discussed

---

[6] Plaintiff suggests the ALJ erred in summarizing the record related to the effectiveness of her medication, noting "The treatment notes show that medication regiment was partially effective on March 26, 2014, April 23, 2014, July 24, 2014, October 23, 2014." (Doc. 14 at 9) (citing AR 683, 685, 689, 691 [Doc. 10-3 at 75, 77, 79, 83] On the other hand, these same treatment notes each contain objective findings from Dr. Glover indicating—despite the partial effectiveness of the medication— that Plaintiff had a normal mood; appropriate affect; and intact memory, thought process, and judgment. (*See* Doc. 10-3 at 75, 77, 79, 83) Accordingly, the ALJ's conclusion that Plaintiff's "mental functioning is generally intact" is supported by the treatment notes.

above, the ALJ rejected the statements of Mr. Ledesma and Plaintiff's subjective complaints. Consequently, the ALJ did not erred by not discussing this evidence related to Plaintiff's daily activities. *See Tappon v. Colvin,* 2014 U.S. Dist. LEXIS 33600, *5 (W.D. Wash. Feb. 25, 2014) (finding where the ALJ rejected the credibility of the claimant's subjective testimony and the claimant did not challenge this finding, "references to [the claimant's] own statements do not establish that the ALJ erred in failing to credit that evidence when assessing the paragraph B criteria").

Further, Plaintiff clearly now takes her statement regarding staying in bed out of context from the hearing, where she testified how she felt if she did not take her depression medication. Plaintiff stated: " If I don't take my depression medication I get really depressed. I get really -- want to stay in bed, don't want to do anything. I'll just stay in bed and don't want to get up and I, you know, I get really depressed." (Doc. 10-3 at 63) However, she also testified that her medication "helps with the conditions a lot." (*Id.*) Thus, as the ALJ observed, Plaintiff testified that her "psychiatric medications are admittedly effective in reducing her mental symptoms" (*id.* at 36), which supports the ALJ's findings regarding Plaintiff's activities of daily living.

Finally, the ALJ's findings regarding Plaintiff's activities of daily living are supported by the notes from Dr. Cohn. (Doc. 10-3 at 32, citing Exh. 6F) As the ALJ observed, in the medical report dated November 19, 2013, Dr. Cohn indicated:

> She is able to take care of personal hygiene tasks including dressing and bathing without difficulty. The claimant has no outside of activities. She is able to pay bills and handle cash appropriately… She has no difficulty completing household tasks and has no difficulty making decisions on a daily basis. On a daily basis, the claimant awakes, does personal hygiene, cooks, cleans, does chores, goes shopping, watches television, reads, eats, and sleeps.

(Doc. 10-10 at 19) With similar activities, courts have determined an ALJ did not err in evaluating the Paragraph B criteria and finding the claimant had mild restrictions with activities of daily living.

For example, this Court determined an ALJ did not err in finding a claimant had mild restrictions where the claimant was able to "attend to his personal hygiene," drive, attend church, perform light housekeeping chores, handled his own bills and money. *Ivy v. Comm'r of Soc. Sec.*, 2011 WL 2038579 at *10, 12 (E.D. Cal. May 24, 2011). Likewise, the Norther District found the ALJ did not err in finding the claimant had no more than mild restrictions where she took care of her personal

hygiene and performed chores, such as "light cleaning and cooking without assistance." *Lewis v.*
*Astrue*, 2012 WL 1067397, at *7(N.D. Cal. Mar. 28, 2012). Given the activities identified by the
ALJ—and Plaintiff's failure to identify any objective medical evidence to the contrary—the Court finds
the ALJ did not err in finding Plaintiff had only a mild restriction with activities of daily living.

### c. Social functioning

The ALJ determined Plaintiff had "mild limitation" with social functioning. (Doc. 10-3 at 32)
The ALJ noted: "She complains complain[ed] of mood swings, irritability, and social withdrawal.
However, there is little objective evidence that she has been involved in serious interpersonal conflicts
or has engaged in major social isolation." (*Id.*) On the other hand, the ALJ noted Plaintiff "frequently
demonstrated cooperative behavior," "was noted to be pleasant," and was "consistently observed to be
calm." (*Id.* at 32-33, citations omitted) The ALJ also noted Plaintiff lived with others, "participate[d]
in church activities twice weekly," "report[ed] having no problems getting along with others." (*Id.*)
The ALJ also found Plaintiff "can be around people," because she was able to "go out alone, shop in
stores, and attend church." (*Id.*)

Plaintiff contends the ALJ erred in finding little objective evidence regarding her social
limitations because:

> At the intake assessment, Nizzoli indicated that her erratic moods cause problems with
> relationship with friends (AR 613); days Nizzoli does not get out of bed. *Id.* In fact a
> progress note dated January 24, 2014, indicated the area of dysfunction in Nizzoli life is
> relationship with friends due to erratic moods. AR 634. Another treatment note dated
> March 19, 2014, also states that Nizzoli continues to be isolating herself. AR 644.
> Another treatment note on October 23, 2014, indicates that Nizzoli avoids people that
> remind her of abuse issues and people who are arguing. AR 683.

(Doc. 14 at 6) Again, however, the treatment notes referred to by Plaintiff contain her *subjective*
reports, rather than *objective* findings.

In January 2014, Plaintiff told Ms. Brown that "her relationships with friends have suffered due
to her erratic moods." (Doc. 10-13 at 2) In February 2014, Plaintiff called County Health and reported
she felt self-conscious about a broken tooth, and her awareness "about her tooth ha[d] caused her to

isolate more than usual."[7]  (*Id.* at 31)  In October 2014, Plaintiff told Dr. Glover that she avoided "people that remind her of abuse issues and people who are arguing."  (Doc. 10-13 at 75)

Plaintiff has not identified any objective evidence showing she has a more than mild limitation with social functioning.  Instead, she relies on selective treatment notes containing her subjective reports to individuals at County Health—which the ALJ alluded to by stating Plaintiff complained of "mood swings, irritability, and social withdrawal" (Doc. 10-3 at 32)— and Plaintiff ignores the objective medical evidence.[8]  Indeed, despite Plaintiff's complaints in October 2014 that she was avoiding people who reminded her of abusive situations, Dr. Glover opined that Plaintiff had a normal mood; appropriate affect; and intact memory, thought process, judgment, and insight.  (Doc. 10-13 at 75)  Further, Plaintiff does not dispute the ALJ's findings that she "can be around people," because she was able to "go out alone, shop in stores, and attend church."  (*See* Doc. 10-3 at 33)  Accordingly, the Court finds Plaintiff fails to show any error with the ALJ's conclusion that she suffers from only mild difficulties with social functioning.

### d. Concentration, persistence, or pace

In reviewing the third functional area of the Paragraph B criteria, the ALJ found Plaintiff has "no more than [a] mild limitation."  (Doc. 10-3 at 33)  The ALJ noted Plaintiff "allege[d] memory and concentration problems," but found "little objective evidence that she has had significant difficulties with concentration, persistence, and pace."  (*Id.*)

According to Plaintiff, the ALJ erred in his analysis because "the ALJ utilized the same reasons as to activities of daily living and social function – however added the additional reason that [Plaintiff] participated in the hearing closely and fully."  (Doc. 14 at 7)  Plaintiff contends the ALJ's observations of her at the hearing do not support the step two findings, because "[t]he fact that Nizzoli could participate in a hearing that started at 1:13pm (AR 48) and ended at 1:38 pm (AR 71) does not always mean that a Nizzoli can function effectively in a workplace."  (*Id.*)  Plaintiff argues: "The ALJ used a

---

[7] Plaintiff cites page 644 of the Administrative Record regarding isolative behavior.  However, this treatment note includes Plaintiff's reports of mood swings and concerns over domestic abuse.  (Doc. 10-13 at 36)  Isolative behaviors were not mentioned as a subject of the phone call.  Rather, her self-report of isolative behavior occurred the prior month.

[8] Notably, the Ninth Circuit determined an ALJ is "not required to discuss every treatment note."  *Giordano v. Astrue*, 304 Fed.Appx. 507, 509 (9th Cir. 2008).  The ALJ's summary of Plaintiff's subjective complaints in the treatment notes was adequate to address her self-reports to County Health.

25-minute hearing that Nizzoli had waited for two years for as a showing that she could concentrate enough to work an 8-hour workday. That makes no sense." (*Id.*)

Importantly, the Ninth Circuit determined "[t]he inclusion of the ALJ's personal observations does not render [a] decision improper." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). An ALJ may use his personal observations when evaluating the credibility of a claimant's subjective complaints. *See Thomas*, 278 F.3d at 960; SSR 96-7p, 1996 SSR LEXIS 4 ("the adjudicator is not free to accept or reject the individual's complaints solely on the basis of such personal observations, but should consider any personal observations in the overall evaluation of the credibility of the individual's statements"). Here, the ALJ considered Plaintiff's ability to concentrate in at the hearing in the context of the credibility of her complaints regarding memory and concentration problems. Indeed, at the hearing Plaintiff said she could "forget what [she was] talking about." (Doc. 10-3 at 64) However, the ALJ "observed that …[Plaintiff] was able to follow closely and participate fully during the hearing." (*Id.* at 33) This observation clearly undermines Plaintiff's complaints, even if the hearing was less than thirty minutes.

Moreover—contrary to Plaintiff's assertion—the ALJ did more than simply reiterate his findings from the first domain regarding Plaintiff's activities of daily living, with the addition of his observations. The ALJ also reviewed objective findings regarding Plaintiff's cognition, memory, and concentration. For example, the ALJ noted that Plaintiff's "cognition was found to be intact on May 23, 2014, May 30, 2014, July 25, 2014, and September 19, 2014." (Doc. 10-3 at 33) The ALJ also found that Plaintiff "generally demonstrated intact memory throughout the adjudicated period" and "exhibited intact concentration on November 19, 2013." (*Id.*)

As the ALJ observed, at the consultative examination in November 2013, Dr. Cohn found "no evidence" of Plaintiff's reported memory and concentration problems after testing Plaintiff's ability to repeat digits, recall items immediately and after a delay, and noting her ability to recall events from her childhood. (Doc. 10-10 at 20-21) In May 2014, Ms. Wiley opined that Plaintiff had an intact cognition at two appointments at the Tuolumne Clinic. (Doc. 10-12 at 19, 21) On May 30, 2014, Dr. Glover also opined that Plaintiff had an intact memory, judgment, insight, and thought process. (Doc. 10-13 at 79) Dr. Glover repeatedly determined that Plaintiff had an "intact memory," even when her medication was

only partially effective, as the ALJ found. (*See* Doc. 10-3 at 86 [February 2014], Doc. 10-13 at 83 [March 2014]; Doc. 10-13 at 77 [July 2014]; Doc. 10-13 at 75 [October 2014] Doc. 10-13 at 73 [January 2015]). These findings support the ALJ's conclusion that Plaintiff had only a mild limitation with her concentration, persistence, and pace.

### 2. ALJ's discounting of Plaintiff's GAF scores

The ALJ observed that Plaintiff "received Global Assessment Functioning (GAF) scores that indicated major limitations in social or occupational functioning." (Doc. 10-3 at 34) The ALJ gave "little weight to those assessments," noting they were "made on a one-time basis." (*Id.*) In addition, the ALJ found the GAF scores were "episodic and do not span a continuous period of at least 12 months." (*Id.*)

Plaintiff contends the ALJ erred in giving little weight to the GAF scores because the scores "substantiate the medical treatment notes of a severe mental impairment." (Doc. 14 at 7) However, the GAF scale "does not have a direct correlation to the severity requirements in the Social Security Administration's mental disorders listings." *Doney v. Astrue*, 485 Fed. App'x. 163, 165 (9th Cir. 2012) (holding "it was not error for the ALJ to disregard [the claimant's] GAF score"). In addition, a low GAF score does not, by itself, establish that the ALJ improperly determined that mental impairments were not severe. *Hammond v. Barnhart*, 124 Fed. App'x 847, 853 (5th Cir. 2005) (affirming ALJ decision where ALJ did not explicitly mention the claimant's low GAF score).

Significantly, the Ninth Circuit observed: "Although GAF scores alone do not measure a patient's ability to function in a work setting, [citation] the Social Security Administration (SSA) has endorsed their use as evidence of mental functioning for a disability analysis." *Craig v. Colvin*, 659 Fed. App'x 381, 382 (9th Cir. 2016), citing SSA Administrative Message 13066 (effective July 22, 2013). Accordingly, the Court determined an ALJ may rely in part upon GAF scores "as a method of quantifying treatment physicians' qualitative assessments of [a claimant's] overall functioning." *Id.* On the other hand, an ALJ may "not use [a] GAF score as an isolated measure of [a claimant's] ability to perform work." *Id.*

Previously, this Court found: "While [a] GAF score does not provide detailed information, it is nonetheless a statement that reflects a physician's judgment about the nature or severity of a patient's

current condition. Thus, a GAF score assigned by a physician is a medical opinion about the level of the patient's functioning at that time." *Hinojos v. Astrue*, 2012 U.S. Dist. LEXIS 182787 (E.D. Cal. Dec. 28, 2012) (citation omitted). Given the limited probative value, "an ALJ has no obligation to credit or even consider GAF scores in the disability determination." *Holcomb v. Colvin*, 2015 U.S. Dist. LEXIS 33036 (Mar. 17, 2015) (citation omitted). Indeed, the Ninth Circuit determined that an "ALJ's failure to address… GAF scores specifically does not constitute legal error." *Id.*, 288 Fed. App'x 357. It follows that the ALJ's rejection of a GAF score does not constitute legal error. *McFarland v. Astrue*, 288 Fed. App'x. 357 (9th Cir. 2008). Consequently, the Court finds the ALJ did not err by failing to evaluate the GAF scores as medical opinions and giving them little weight.

### 3. Substantial evidence supports the ALJ's step two findings

Defendant contends the step two findings of the ALJ are supported by substantial evidence in the medical record, and Plaintiff erroneously "offers her own interpretation of the evidence." (Doc. 16 at 4-6) Notably, "[t]he role of this Court is not to second guess the ALJ and reevaluate the evidence, but rather it must determine whether the decision is supported by substantial evidence and free of legal error." *Gallardo*, 2008 U.S. Dist. LEXIS 84059 at *30; *see also German v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 25691 at *11-12 (E.D. Cal. Mar. 14, 2011) ("[i]t is not for this court to reevaluate the evidence"). The term "substantial evidence" "describes a quality of evidence ... intended to indicate that the evidence that is inconsistent with the opinion need not prove by a preponderance that the opinion is wrong." SSR 96-2p, 1996 SSR LEXIS 9 at *8[9]. "It need only be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion." *Id.*

The ALJ's conclusions regarding the Paragraph B criteria are supported by the opinions of Drs. Cohn, Vea, and Jacobs, which the ALJ gave "significant weight." (*See* Doc. 10-3 at 33) As the ALJ observed, Dr. Cohn "conducted the mental consultative examination on November 19, 2013, [and]

---

[9] Social Security Rulings (SSR) are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner. 20 C.F.R. § 402.35(b)(1). Although they do not have the force of law, the Ninth Circuit gives the Rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989); *see also Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006) ("SSRs reflect the official interpretation of the [SSA] and are entitled to 'some deference' as long as they are consistent with the Social Security Act and regulations").

concluded that the claimant had no significant mental limitations." (*Id.*) Drs. Vea and Jacobs, non-examining physicians who are "mental health specialists," "also assessed that the claimant had no more than mild limitation in any of the first three functional areas and no extended episodes of decompensation." (*Id.* at 33-34)

When the opinions of a physician "rest[] on independent examination," the opinions constitute substantial evidence. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001); *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (when an examining physician provides independent clinical findings, such findings are substantial evidence). Because Dr. Cohn reached his decision after testing Plaintiff's memory, questioning her to determine her insight and judgment, and observing her concentration for the examination, his opinion is substantial evidence supporting the finding that Plaintiff's mental impairments are not severe. *See Tonapetyan*, 242 F.3d at 1149; *Orn*, 495 F.3d at 632.

Likewise, the opinions of Drs. Vea and Jacobs opined that Plaintiff did not have severe mental impairments. (Doc. 10-4 at 10, 39) Specifically, Drs. Vea and Jacobs concluded that Plaintiff had no restrictions with her activities of daily living; no difficulties with maintaining social functioning; and mild difficulties with maintaining concentration, persistence, and pace. (*Id.*) Because the physicians concluded the limitations in these three functional limitations were "none" or "mild," they concluded Plaintiff's impairment were "non-severe." (*See id.* at 39; 20 C.F.R. § 404.1520a(d)(1)) These conclusions were consistent with the findings of Dr. Cohn. Consequently, the opinions of Drs. Vea and Jacob are also substantial evidence supporting the ALJ's step two determination. *See Andrews v. Shalala*, 53 F.3d 1035, 1042 (9th Cir. 1995) (opinions of non-examining physicians "may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it"); *Tonapetyan*, 242 F.3d 1149 (the opinions of non-examining physicians "may constitute substantial evidence when … consistent with other independent evidence in the record").

## CONCLUSION AND ORDER

For the reasons set forth above, the Court finds the ALJ did not err in evaluating the evidence related to Plaintiff's mental impairments, and substantial evidence in the record supports the ALJ's findings at step two. Thus, the Court must uphold the ALJ's conclusion that Plaintiff is not disabled as defined by the Social Security Act. *See Sanchez*, 812 F.2d at 510.

Based upon the foregoing, the Court **ORDERS**:

1.      The decision of the Commissioner of Social Security is **AFFIRMED**; and

2.      The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Sandra Lynn Nizzoli.

IT IS SO ORDERED.

Dated:   **September 25, 2018**       **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE